IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MEHDI NOOHI,                            \*
SOHEYLA BOLOURI, *et al.*
                                          \*

    Plaintiffs,
                                          \*

v.                                                  Civil Action No. RDB-11-00585
                                          \*

TOLL BROS., INC, *et al.*
                                          \*

    Defendants.
\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## **MEMORANDUM OPINION**

This is a breach of contract action for damages and other relief arising out of an Agreement of Sale ("the Agreement") signed by the parties for the purchase of a home. Mehdi Noohi and Soheyla Bolouri, husband and wife (collectively "Plaintiffs"), bring this action, individually and on behalf of all others similarly situated, against Toll Bros., Inc., and its wholly-owned subsidiaries and agents Toll Land Corp. No. 43 and Toll MD V Limited Partnership (collectively "Defendants") as well as all other similarly situated entities by or through which Toll Brothers markets and sells residential real estate properties within the United States and its territories. Plaintiffs seek damages equal to the amount of the $77,008 deposit withheld by Defendants even though the sales agreement never reached closing, along with compensatory, consequential and punitive damages. Additionally, Plaintiffs allege that from 2006 through 2009, Defendants retained $106.2 million in customer deposits from similarly situated plaintiffs and therefore request that this Court certify a class action.

1

The parties' submissions have been reviewed and this Court held a hearing on January 23, 2012 pursuant to Local Rule 105.6. For the reasons that follow, Defendants Toll Brothers, Inc., Toll MD V Limited Partnership, and Toll Land Corp. No. 43's Motion to Dismiss or Stay Plaintiffs' Complaint Pending Arbitration (ECF No. 5) is DENIED.

BACKGROUND

Plaintiffs, Mehdi Noohi and Soheyla Bolouri, husband and wife, bring claims of breach of contract, breach of duty of good faith and fair dealing, unjust enrichment and unfair and deceptive trade practices in violation of Maryland law against Defendants. Specifically, Plaintiffs allege that Defendants have engaged in a "scheme to improperly retain" deposits paid by prospective home buyers despite their failure to obtain financing to pay for homes sold by the Defendants. Pls.' Compl. ¶1. In ruling on a motion to dismiss, the factual allegations in the plaintiffs' complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff. *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

Toll Brothers is a publically traded residential and commercial real estate development company which sells luxury residences in detached and attached home communities, golf communities and urban low-, mid- and high-rise communities. Pl.'s Compl. ¶¶14-15. Toll Brothers operates in about twenty states, including Maryland, and conducts business through its own "architectural, engineering, mortgage, title, land development and land sale, golf course development and management, home security and landscape subsidiaries." *Id.* at ¶16. Toll Land Corp. No. 43 is one of its wholly-owned subsidiaries which contracts with individual home buyers for the purchase of newly

constructed or to be constructed homes. *Id.* at ¶19. Toll Land Corp. No. 43 is the General Partner in Toll MD V Limited Partnership with whom Plaintiffs sought to purchase a home to be constructed in Glenelg, Maryland. *Id.* at ¶¶9, 25. TBI Mortgage Company is a Toll Brothers subsidiary which provides mortgages to Toll Brothers home buyers. *Id.* at ¶17. Plaintiffs have filed claims against Defendants individually and on behalf of a class of similarly situated home buyers.

    a. *Plaintiffs' Individual Claims*

In 2008, Plaintiffs contracted to purchase a Hampton Versailles style home from Defendants to be built on Lot 58 of the community known as The Reserve at Triadelphia Crossing in Glenelg, Maryland. Pls.' Compl. ¶¶25. As required, on February 17, 2008, Plaintiffs made an initial reservation deposit of $5,000, and on February 24, 2008, they entered into an Agreement of Sale ("the Agreement") with Toll MD V for the purchase of the home in question for $1,006,975. *Id.* at ¶¶25-27. Upon signing the Agreement, Plaintiffs made an additional deposit of $45,348 and later deposited an additional $26,660 for "options ordered on the home." *Id.* at ¶¶29-30. In sum, by February 28, 2008, Plaintiffs had allegedly paid $77,008 to Toll Brothers for the purchase of their preconstruction home.

According to the Agreement, Defendants were to hold the deposit until it was to be refunded or forfeited by Plaintiffs. *Id.* at ¶32; *see also* Agreement of Sale, § 4 (ECF No. 5-2). The Agreement also directed Plaintiffs to complete the mortgage approval process within 60 days. *Id.* at ¶¶33-35. In order to do so, Plaintiffs agreed to make truthful disclosures to lending companies, to immediately send copies of any notices to Defendants and accept a

loan commitment as well as comply with all terms imposed by the lender. *Id.* at ¶35; *see also* Agreement of Sale, § 4 (ECF No. 5-2).  In the event that Plaintiffs could not be approved for a mortgage after 60 days, the Agreement provided that the Defendants could (1) extend the mortgage application period in order to submit a mortgage request for Plaintiffs themselves, or (2) declare the Agreement "null and void" and refund Plaintiffs their deposit. *Id.* at 36; *see also* Agreement of Sale, § 4 (ECF No. 5-2).[1]

Plaintiffs allege that they complied with their obligations under the Agreement and submitted numerous mortgage applications which were all subsequently rejected. *Id.* at ¶38. Plaintiffs first applied to TBI Mortgage on February 25, 2008, but their application was rejected. *Id.* at ¶39.  Then, upon Defendants' recommendation, Plaintiffs applied for a mortgage with First Preferred Financial, Inc. *Id.* at 40.  On April 24, 2008, Plaintiffs allegedly received a loan commitment letter for $906, 275 which they accepted in compliance with the Agreement. *Id.* at ¶41.  However, on June 13, 2008, First Preferred Financial informed Plaintiffs that it could no longer provide them with financing because it could not comply with a recent Maryland law prohibiting state income loans. *Id.* at 42.  Then Plaintiffs allege that they also sought to obtain financing from GMAC but were unsuccessful. *Id.* at 43.

---

[1] Section 4 of the Agreement specifically provides that: ". . . Buyer shall furnish, within 5 days of any request, all information required by any Lender, Buyer acknowledges that Seller is relying on Buyer's information to determine to proceed with building the home.  Buyer agrees immediately to send Seller copies of any notice from Buyer's lender(s) rejecting Buyer's loan application(s).  If Buyer is not approved for a mortgage within 60 days of the date of Buyer's execution of this Agreement, Seller may extend the mortgage application approval process until such time as: (1) Seller submits another application on substantially the same terms described above to a lender chosen by Seller, with no additional application fee to Buyer, or (2) Seller declared this Agreement null and void in which event all sums paid on account of the purchase price and extras shall be returned to Buyer without interest, neither party shall have any further rights or liabilities hereunder. . ."

Following these repeated failures, Plaintiffs sent a letter to Defendants on July 24, 2008 informing them that they were unable to secure financing for the home purchase and requesting a refund of their deposit pursuant to the Agreement of Sale. *Id.* at ¶44. Defendants, however, allegedly responded that the First Preferred Financial commitment letter, although now terminated, had satisfied the mortgage contingency and that Plaintiffs were obligated to perform under the Agreement. *Id.* at ¶45. Plaintiffs claim that Defendants further instructed them to continue to apply for mortgages and specifically to contact APEX Funding Group. *Id.* at ¶¶46, 48. On September 22, 2008, APEX Funding Group gave Plaintiffs a loan commitment letter but thereafter denied to approve them for a mortgage. *Id.* at ¶49. Although Plaintiffs further sought mortgage approvals from other lenders, they were unable to secure financing. *Id.* at ¶50. Moreover, Plaintiffs allege that Defendants have neither begun construction on Lot 58 nor have they incurred expenses toward the construction of the home. *Id.* at ¶52. In light of Plaintiffs' repeated failures to secure financing and Defendants continued objections to refunding their deposits, Plaintiffs claim that Defendants breached the Agreement and improperly retained their moneys. *Id.* at ¶51.

  b. *Plaintiffs' Claims in Support of a Class Action*

Additionally, Plaintiffs move this Court to certify a class action pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of:

> "All home buyers or prospective home buyers, in the United States of America and its territories, that entered into an Agreement of Sale for the purchase of a home with Toll Bros., Inc. and/or any member of the class of defendants on or after January 1, 2004 who did not thereafter receive approval for a mortgage, and who have not received the return of their deposit(s)."

Pls.' Compl. at ¶58.  Plaintiffs also seek to bring this lawsuit against a class of defendants to include: "[all] subsidiaries, agents, or other entities in which Toll Bros., Inc., directly or indirectly holds a controlling interest and which have entered into Agreements of Sale for homes in the United States of America and its territories on or after January 1, 2004." *Id.* at ¶59.  In support of this request, Plaintiffs claim that Defendants "routinely enter into Agreements of Sale with prospective buyers" and fail to return their deposits when these buyers are unable to obtain a mortgage approval.  *Id.* at ¶22.  Particularly, Plaintiffs allege that from 2006 to 2009 "Toll Brothers retained $106.2 million in customer deposits where sales agreements never reached closing" and, that from 2007 through 2009, 3,030 prospective buyers were affected by such practices.  *Id.* at ¶¶23, 60.  Plaintiffs further contend that Defendants' policy of retaining deposits while "incurring no actual costs or damages associated with the cancellation of the sales contracts . . . [is] the largest source of [their] profits." *Id.* at ¶ 24.  Finally, Plaintiffs claim that the class of plaintiffs and the class of defendants are sufficiently numerous and dispersed throughout the United States that "joinder would be impractical" and that common questions of fact and law exist with respect to Plaintiffs claims as to the Agreements of Sale and Defendants' breach that a class certification is warranted.  *Id.* at ¶¶60-62.[2]

---

[2] During the January 23, 2012 hearing, counsel for Defendants admitted that Agreements of Sale similar to the one at issue in this case are used in all home purchase transactions.

*c. Procedural Posture*

In their Motion to Dismiss or Stay Plaintiffs' Complaint Pending Arbitration (ECF No. 5) Defendants contend that Section 13 of the Agreement of Sale is a mandatory arbitration clause which covers the causes of action brought by the Plaintiffs. Consequently, Defendants contend that Plaintiffs should not be permitted to bring this action before this Court. In response, Plaintiffs argue that the arbitration clause contained in the Agreement is unenforceable. On January 23, 2011, this Court held a hearing on Defendants' motion. While numerous issues were addressed by counsel, it was agreed that the sole issue with respect to the pending motion is the validity of the arbitration clause.[3]

## STANDARD OF REVIEW

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1, *et seq.* requires that "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* at § 2. The Supreme Court has recently noted that arbitration agreements "may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. __, 131 S. Ct. 1740 (2011) (citing *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687 (1996)) (internal

---

[3] At the hearing on January 23, 2012, counsel for the Defendants acknowledged that the subject motion to dismiss was not based on any alleged deficiencies in stating the cause of action pursuant to any analysis under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. __, 129 S. Ct. 1937, 1949 (2009) Counsel agreed that the sole issue is whether this action is barred by the arbitration clause.

quotations omitted). The FAA also requires that a federal court stay any proceedings that present a controversy which the parties have agreed to arbitrate. *Id.* at § 3. Moreover, the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." [4] *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983).

Despite this presumption, agreements to arbitrate are fundamentally about private choice. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). Federal courts have the authority to compel arbitration, but in making that determination this Court is mindful that its role is limited to determining the "question of arbitrability," or the "gateway dispute about whether the parties are bound by a given arbitration clause." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002).

According to the United States Court of Appeals for the Fourth Circuit, a litigant can compel arbitration under the FAA if he can demonstrate "(1) the existence of a dispute

---

[4] Defendants bring this action under the FAA pursuant to the arbitration clause in the Agreement of Sale. However, while the FAA applies to diversity cases involving interstate commerce, *American Home Assurance Co. v. Vecco Concrete Construction*, 629 F.2d 961, 963 (4th Cir. 1980), state arbitration law governs transactions involving intrastate commerce. *See, e.g., Mortimer v. First Mount Vernon Indus. Loan Ass'n,* AMD–03–1051, 2003 WL 23305155, at *1–*2 (D. Md. May 19, 2003). The Maryland Uniform Arbitration Act ("MUAA") is the "state analogue to the FAA [and] Maryland courts rely on the federal FAA decisions when construing the MUAA." *Rota-Mclarty v. Santander Consumer USA, Inc.*, WSQ-10-0908, 2011 WL 2133698, at * 3 n.10 (May 26, 2011) (citing *Holmes v. Coverall N. Am., Inc.,* 649 A.2d 365, 368 (Md. 1994)). The MUAA also favors the enforcement of arbitration agreements which are "valid, enforceable, and irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract." *Rota-Mclarty*, 2011 WL 2133698, at * 3 (citing Md. Code Ann., Cts & Jud. Proc. § 3-206(a)) (internal quotations omitted).

between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute." *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991). "Agreements to arbitrate are construed according to ordinary rules of contract interpretation, as augmented by a federal policy requiring that all ambiguities be resolved in favor of arbitration." *Gadson v. SuperShuttle Int'l*, AW-10-01057, 2011 WL 1231311, at *3 (D. Md. Mar. 30, 2011) (citing *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.,* 252 F.3d 707, 710 (4th Cir.2001). Indeed, the Supreme Court has directed that questions relating to the "validity, enforceability, or revocability" of an arbitration agreement should be resolved according to state law, *Perry v. Thomas,* 482 U.S. 483, 493 n. 9 (1987), while the FAA establishes the "federal substantive law of arbitrability." *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24; *see also Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540 (4th Cir. 2005).

ANALYSIS

Defendants argue that this action should be dismissed or stayed pending arbitration because the Agreement of Sale ("the Agreement") signed between the parties includes a mandatory arbitration clause, Section 13. Plaintiffs, however, contend that the arbitration clause is unenforceable for lack of mutuality of consideration and that therefore they are entitled to bring this suit before this Court.[5]

---

[5] Plaintiffs also argue that even if the arbitration provision is held to be enforceable, Defendants defaulted under Section 10(b) of the Agreement by failing to begin construction on the property within two years of the signing of the Agreement. Therefore, Plaintiffs argue that Section 7(c) allows them to bring "all claims" against Defendants in this Court. This Court does not reach this argument as it finds the arbitration provision to be unenforceable.

Under the Federal Arbitration Act,[6] arbitration agreements are "valid, irrevocable and unenforceable, save upon such grounds as exist at law or equity for the revocation of any contract." 9. U.S.C. § 2. State contract formation law determines the validity of arbitration agreements. *AT&T Mobility LLC v. Concepcion*, 563 U.S. ___, 131 S. Ct. 1740, 1745-46 (2011); *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540 (4th 2005). In Maryland, "the law of the jurisdiction where the contract was made ["lex loci contractus"] controls its validity and construction." *Kramer v. Bally's Park Place, Inc.,* 535 A.2d 466, 467 (Md. 1988). As this case involves the issue of the validity of the arbitration agreement and because the contract was entered into by the parties in Maryland, Maryland law governs.

Under Maryland law, an agreement to arbitrate disputes is enforceable if it is a valid contract. *Hill*, 412 F.3d at 543; *see also Cheek v. United Healthcare of Mid–Atlantic, Inc.,* 835 A.2d 656, 661 (Md. 2003). Moreover, "an arbitration clause is a severable contract which is enforceable independently from the contract as a whole." *Holmes v. Coverall North America, Inc.*, 649 A.2d 365, 370 (Md. 1994); *see also Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. ___, 130 S. Ct. 2847, 2858 (2010) (Under "the FAA . . . courts treat an arbitration clause as severable from the contract in which it appears and enforce it according to its terms unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause itself."). To determine the validity of the arbitration agreement, Maryland courts look at the four-corners of an arbitration provision. *See Cheek*, 835 A.2d at 664-65; *see also Hill*, 412 F.3d at 543. As with any contract, the arbitration

---

[6] The Maryland Uniform Arbitration Act employs similar language. Md. Code Ann., Cts & Jud. Proc. § 3-206(a).

10

provision must be supported by adequate consideration in order to be valid and enforceable. *See Cheek*, 835 A.2d at 661.

In *Cheek* the Maryland Court of Appeals determined that the mutual exchange of promises to arbitrate disputes represented the necessary consideration in support of an arbitration agreement. *Cheek*, 835 A.2d at 665 ("each party has promised to arbitrate disputes arising from an underlying contract, and 'each promise provides consideration for the other.' " (quoting *Holmes*, 649 A.2d at 370)). *See also Rose v. New Day Financial, LLC*, WDQ-10-2761, 2010 WL 4103276 at *9 (D. Md. Sept. 9, 2011) (citing *Dieng v. College park Hyundai*, DKC-2009-0068, 2009 WL 2096076 at *3 (D. Md. July 9, 2009) (Under Maryland law "[i]n arbitration agreements, the exchanged promises to arbitrate constitute the consideration that forms the basis of the agreement."), and *Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547 (Md. 2006) (quoting *Cheek*, 835 A.2d at 665)) ([M]utual promises to arbitrate act as an independently enforceable contract ... [ *i.e.,*] each party has promised to arbitrate disputes arising from an underlying contract, and 'each promise provides consideration for the other.' "). Therefore, under Maryland law mutuality of consideration is essential to the validity of an arbitration agreement.

Additionally, the Maryland Court of Appeals held in *Cheek* that where a party reserves the right to "alter, amend, modify or revoke" an arbitration agreement, the party makes an illusory promise and that where an illusory promise is involved, the arbitration agreement is unenforceable for lack of consideration. *Cheek*, 835 A.2d at 662, 669. In *Howard v. King's Crossing, Inc.*, 264 F. App'x. 345 (4th Cir. 2008), applying the Court of Appeals' decision in *Cheek*, the Fourth Circuit held that an arbitration agreement imposing obligations and

11

waivers on only one party was unenforceable. Although mutuality of consideration is required, identical mutuality need not exist between parties before an arbitration agreement can be deemed valid. *Whalter v. Sovereign Bank*, 872 A.2d 735, 748-49 (Md. 2005) ( an "arbitration agreement . . ., which includes exceptions to that agreement that enable [a party] . . . to pursue certain judicial remedies including foreclosure, is not made unconscionable where [the other party is] not provided with identical exceptions to the arbitration agreement.").[7]

In this case, Section 13 of the Agreement of Sale provides that:

> "13. ARBITRATION: Buyer, on behalf of Buyer, and all permanent residents on the Premises, including minor children, hereby agree that any and all disputes with Seller, Seller's parent company or their subsidiaries or affiliates arising out of the Premises, this Agreement, the Home Warranty, any other agreements, communications or dealings involving Buyer, or the construction or condition of the Premises including, but not limited to, disputes concerning breach of contract, express and implied warranties, personal injuries and/or illness, mold related claims, representations and/or omissions by Seller, on-site and off-site conditions and all other torts and statutory causes of action ("Claims") shall be resolved by binding arbitration in accordance with the rules and procedures of Construction Arbitration Services, Inc. ("CAS") or its successor or an equivalent organization mutually agreed upon by the parties. If CAS is unable to arbitrate a particular claim, then that claim shall be resolved by binding arbitration pursuant to the Construction Rules of Arbitration of the American Arbitration Association or its successor or an equivalent organization mutually agreed upon by the parties. In addition, Buyer agrees that Buyer may not initiate any arbitration proceeding for any Claim(s) unless and until Buyer has first given Seller specific written notice of each claim (at 250 Gibraltar Road, Horsham, PA 19044, Attn: Warranty Dispute Resolution) and given Seller a reasonable opportunity after such notice to cure any default, including the repair of the Premises in accordance with the Home Warranty. The provisions of this paragraph shall be governed

---

[7] It is important to note that in *Whalter*, the arbitration clause read "the parties agree that any claim, dispute, . . . shall be resolved by binding arbitration . . ." *Id.* at 739.

by the provisions of the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq*. and shall survive settlement. . . .

BUYER HEREBY WAIVES THE RIGHT TO A PROCEEDING IN A COURT OF LAW (INCLUDING WITHOUT LIMITATION A TRIAL BY JURY) FOR ANY CLAIMS OR COUNTERCLAIMS BROUGHT PURSUANT TO THIS AGREEMENT, THE PROVISIONS OF THIS SECTION SHALL SURVIVE SETTLEMENT. . . ."

This provision is quite simply one-sided and onerous. It mandates that buyers, or in this case Plaintiffs, promise to (1) submit all disputes against seller to binding arbitration, (2) notify Defendants of each claim before they initiate arbitration proceedings, (3) give Defendants a reasonable opportunity to cure the default, and (4) waive the right to proceed in a court of law. (quotations omitted). Conversely, Defendants do not make any promises to Plaintiffs in this provision. The clause does not state "Buyer and Seller," or even "the parties" and thus does not impose any obligations on the Defendants. It only refers to "Buyers" and their obligations.

During the hearing, Defendants argued that the terms "with Seller, Seller's parent company or their subsidiaries or affiliates" were sufficient to indicate that the Seller also agreed to arbitrate. Moreover, Defendants claimed that were they to instigate proceedings in court of law or equity, Plaintiffs would have the right to compel arbitration under the same Agreement.[8] However, as the Fourth Circuit clearly recognized in *Howard v. King's Crossing,*

---

[8] Defendants also refer this Court to the United States District Court for the District of New Jersey's decision in *Arakelian v. N.C. Country Club Estates Limited Partnership,* No. 08-5286, 2009 WL 4981479 (D. N.J. Dec. 18, 2009). In that case involving similar claims by a prospective home buyer against TBI Mortgage, the court enforced a similarly worded arbitration agreement and stayed the litigation pending arbitration. In making this determination, the court found that North Carolina law applied and that plaintiffs had failed to show that the arbitration agreement was procedurally and substantively unconscionable. This case is, therefore, distinguishable from the case at bar due to the express conditions for the formation of a valid contract imposed by Maryland law.

13

*Inc.*, one-sided arbitration provisions are unenforceable under Maryland law. 264 F. App'x. 345 (4th Cir. 2008). In order for a contract, and therefore an arbitration clause to be valid under Maryland law, it must be supported by consideration. Although the obligations need not be identical, each party must promise to arbitrate at least some types of disputes. In this case, the arbitration clause only indicates that Plaintiffs agreed to submit their disputes against Defendants to arbitration and the clause itself is devoid of any indication that Defendants made a similar promise. As such, Section 13 of the arbitration agreement is unenforceable and Plaintiffs can proceed with this action in this Court. Thus, Defendants Motion to Dismiss or Stay Plaintiffs' Complaint Pending Arbitration is DENIED.

## CONCLUSION

For the reasons stated above, Defendants Toll Brothers, Inc., Toll MD V Limited Partnership, and Toll Land Corp. No. 43's Motion to Dismiss or Stay Plaintiffs' Complaint Pending Arbitration (ECF No. 5) is DENIED.

A separate Order follows.

Dated:      January 30, 2012                /s/_____
                                            Richard D. Bennett
                                            United States District Judge